## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

United States of America,

v.                                          Case No. 4:03-cr-45-MLB

Ras Rahim,

     Defendant.

_____/

## **OPINION & ORDER**

  Defendant Ras Rahim moves for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) based on "extraordinary and compelling reasons." (Dkt. 186.) After reviewing the submissions of the parties, and upon consideration of the testimony and argument presented during two hearings, the Court grants his motion.[1]

## I.  Background

  The facts of this case—that is, the crimes Rahim committed to end up in prison—are egregious and do not obviously support a reduction of his sentence. On July 8, 2003, twenty-year-old Rahim entered a

_____

[1] The Court held hearings on March 3 and 22, 2021, the first to hear argument from counsel and the second to hear from Rahim. (Dkts. 205; 206.)

SouthTrust bank branch in Cartersville, Georgia, pulled a firearm, and demanded a teller put money in a bag. (Dkt. 191 at 2.) The teller gave him $4,700 and several security devices that exploded when he left the bank and got in his car. (*Id.*) Rahim thus abandoned his car and fled to a nearby store. (*Id.*) He tried to take a car from an employee and, when she said she did not have one, turned to Hazel King, a grandmother and employee of the store. (*Id.*) He demanded her car keys but then insisted she leave with him. (*Id.*) Holding Ms. King in a headlock and with a gun to her head, Rahim led her to her car, forced her into it, and made her drive him away. (*Id.*) Police officers shot out three of her tires, and Ms. King brought her car to a stop. (*Id.* at 3.) Rahim, again holding Ms. King in a headlock with a gun to the side of her head, led Ms. King out of the car and into a wooded area nearby. (*Id.*) The police surrounded them, and a standoff ensued. (*Id.*) Police soon saw that Rahim actually had two pistols. (*Id.*) At one point, Rahim told Ms. King to lie on the ground and began firing at a police sniper. (*Id.* at 4.) He shot until he ran out of ammunition. (*Id.*) The sniper then shot Rahim in the head, dropping him to the ground and ending the confrontation. (*Id.*)

The way Rahim was charged—at least under today's standards—are extreme and support a reduction in sentence.  In addition to charging him with bank robbery and carjacking, the government charged him with two violations of 18 U.S.C. § 924(c), one for his use of the firearm during the bank robbery and one for his use of the firearm during the carjacking. (*Id.*)  A jury convicted Rahim on all four counts.[2]  (*Id.*)  At sentencing on February 16, 2005, the Court imposed a sentence of 481 months.  This included concurrent sentences of 97 months imprisonment for the bank robbery and carjacking convictions to run consecutively with 84 months imprisonment on the first firearms charge and an additional 300 months imprisonment on the second firearms charge.  (*Id.* at 5.)  His projected release date is October 25, 2037.  (*Id.* at 6.)

Rahim has sought, unsuccessfully, to obtain relief from this sentence with direct appeals, collateral attacks, and requests to the

---

[2] The Assistant United States Attorney responsible for Rahim's prosecution explained that the Department of Justice policy in place at the time required criminal defendants facing multiple § 924(c) charges to plead guilty to at least two charges.  He believes Rahim (like many other criminal defendants at the time) exercised his right to a trial rather than pleading guilty because of the significant jail time such a plea would have mandated.  (March 3rd Hearing Tr. at 47:22–48:5.)

United States Attorney.[3]  (Dkt. 186 at 6–7.)  Rahim also submitted a written request to the warden of the institution where he is incarcerated on December 3, 2019, requesting that the Bureau of Prisons ("BOP") move this Court for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i).  (*Id.* at 9.)  The warden denied Rahim's request on January 17, 2020.  (*Id.*)  Rahim now moves this Court for a reduction of his sentence to time served based on "extraordinary and compelling reasons." (*Id.* at 6.)  The government opposes his motion.  (Dkt. 191.)

## II.  Discussion

### A.   Exhaustion

"The authority of a district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Phillips*, 597 F.3d 1190, 1194–95 (11th Cir. 2010).  Before the enactment of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 ("First Step Act"), compassionate release was available only if the BOP filed a motion requesting it.  *See* 18 U.S.C. § 3582 (as effective Nov. 2, 2002 to Dec. 20, 2018).  Now, however, the First Step Act enables a defendant to file a motion for compassionate release directly with the sentencing court,

---

[3] *See, e.g.*, *United States v. Rahim*, 431 F.3d 753 (11th Cir. 2005).

provided he has (a) fully exhausted all administrative remedies to appeal the BOP's refusal to bring a motion, or (b) 30 days have elapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.  18 U.S.C. § 3582(c)(1)(A); *see also United States v. Haynes*, 456 F. Supp. 3d 496, 506 (E.D.N.Y. 2020) ("[U]nder the amended statute, a prisoner may bring the motion himself, provided the statutory exhaustion or lapse-of-thirty-day requirement is satisfied."). Rahim submitted his compassionate release request to the warden of his facility on December 3, 2019.  (Dkt. 186 at 9.)  The warden denied that request on January 17, 2020.  (*Id.*)  As more than thirty days have elapsed since that event, Rahim may bring his motion directly to this Court.

### B.  Merits

#### 1.  The Court's Authority to Determine What Qualifies as "Extraordinary and Compelling"

Where the exhaustion requirement is satisfied, the compassionate release provision in § 3582(c)(1)(A)(i) authorizes a court to modify a term of imprisonment after considering the factors set forth in § 3553(a), if it finds that "extraordinary and compelling circumstances" warrant a reduction and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.  18 U.S.C.

§ 3582(c)(1)(A)(i).  Congress never defined "extraordinary and compelling reasons."  Instead, Congress directed the Sentencing Commission, in promulgating the policy statement, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).  The only specific instruction set forth by Congress is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  *Id.*

Prior to the First Step Act, the Sentencing Commission had issued a policy statement to implement the prior version of § 3582—that is, the version that allowed compassionate release only upon application from the BOP.  The statement, found in U.S.S.G. § 1B1.13 and the accompanying Application Notes, provides that a court may reduce a term of imprisonment

> if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the court determines that—
>
> (1)(A) [e]xtraordinary and compelling reasons warrant the reduction; . . . .
>
> (2) [t]he defendant is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g); and

6

>      (3) [t]he reduction is consistent with this policy
>      statement.

U.S.S.G. § 1B1.13.  The Application Notes list three circumstances that qualify as extraordinary and compelling: (1) a medical condition, (2) advanced age, and (3) family circumstances.  *Id.* n.1(A)–(C).  The Application Notes also contain a catchall clause, entitled "Other Reasons," whereby the Director of the BOP may determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  *Id.* n.1(D).

This final catchall clause vests the Director of the BOP with the authority to determine when other extraordinary and compelling reasons may exist to warrant a reduction in a particular case.  *Id.*  Importantly, the Sentencing Commission has not updated U.S.S.G. § 1B1.13 and the accompanying Application Notes since passage of the First Step Act to reflect Congress's intention that inmates be permitted to file motions for compassionate release without going through the BOP.  Rahim argues that vesting authority over the catchall clause to the BOP is "inconsistent and cannot be reconciled with the revised statute."  (Dkt. 186 at 17.)  The government argues that, even though the First Step Act removed the

7

BOP as gatekeeper to the courts for compassionate release, Congress intentionally left the BOP in charge of the catchall clause. (Dkt. 191 at 17.)  The Court must decide whether the First Step Act allows courts independently to determine what reasons, for purposes of compassionate release, are "extraordinary and compelling" or whether that power remains exclusively with the Director of the BOP as stated in the catchall clause.

As with all instances of statutory interpretation, the Court begins with the text.  *See United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) ("The starting point for all statutory interpretation is the language of the statute itself.").  Section 3582(c)(1)(A)(i), after being amended by the First Step Act, now reads:

> (A) *the court*, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, *may reduce the term of imprisonment* (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, *if it finds that—*

8

> (i) *extraordinary and compelling reasons warrant such a reduction . . .*
>
> *. . . .*
>
> *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .*

18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).  As explained above, the main difference with this statute after the passage of the First Step Act is that a prisoner may bring his or her compassionate release claim directly to the court provided the statutory exhaustion or lapse-of-thirty-day requirement is satisfied.  Congress clearly gave district courts the authority to determine whether an inmate's circumstances present extraordinary and compelling reasons for a sentence reduction.  The statute nevertheless requires courts to ensure any sentence reduction is consistent with "applicable" policy statements.  So, the question then is whether the Sentencing Commission's policy in the current version of U.S.S.G. § 1B1.13 and the accompanying Application Notes remain "applicable" to this matter given the passage of the First Step Act.

The text of U.S.S.G. § 1B1.13 supports a finding that the policy statement is inapplicable to Rahim's situation.  It begins: "[u]pon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A),

the court may reduce a term of imprisonment . . . ."  U.S.S.G. § 1B1.13.

That is precisely the requirement the First Step Act removed.  U.S.S.G.

§ 1B1.13 is thus clearly outdated and does not reflect the First Step Act's

reforms to compassionate release.[4]  The Court finds U.S.S.G. § 1B1.13

survives the First Step Act, but it now applies only to motions that the

BOP makes, not motions by prisoners.  *See, e.g.*, *United States v. Brooker*,

976 F.3d 228, 235–36 (2d Cir. 2020) ("[T]hough motions by the BOP still

remain under the First Step Act, they are no longer exclusive, and we

read the Guideline as surviving, but now applying only to those motions

that the BOP has made. . . . Because Guideline § 1B1.13 is not

'applicable' to compassionate release motions brought by defendants,

Application Note 1(D) cannot constrain district courts' discretion to

consider whether any reasons are extraordinary and compelling.").

Based on this statutory interpretation, the Court agrees with

Rahim and finds the reference to the BOP Director in the catchall clause

---

[4] Section 3553(a)(5) of Title 18 anticipates this problem.  It provides that
the court, when imposing a sentence, must consider "any pertinent policy
statement . . . issued by the Sentencing Commission . . . , subject to any
amendments made to such policy statement by act of Congress
(regardless of whether such amendments have yet to be incorporated by
the Sentencing Commission into amendments . . . )."    18 U.S.C.
§ 3553(a)(5).

Case 4:03-cr-00045-MLB-WEJ   Document 209   Filed 04/14/21   Page 11 of 29

a relic of the pre-First Step Act regime.  The Court further finds the Sentencing Commission's policy in U.S.S.G. § 1B1.13 and the accompanying Application Notes inapplicable to a compassionate release motion brought by inmates.  It thus does not constrain this Court's consideration of whether Rahim has shown extraordinary and compelling reasons for compassionate release under § 3582.

This reading aligns with congressional intent in passing the First Step Act.  After watching decades of the BOP's failure to bring any significant number of compassionate release motions before the courts,[5] Congress permitted prisoners seeking compassionate release to avoid the BOP entirely if they meet one of two exhaustion requirements.  *See* 18 U.S.C. § 3582(c)(1)(A).  Because Congress wanted to remove the BOP as the gatekeeper to compassionate release, it would make little sense to leave the BOP as the authority over one of the compassionate release

---

[5] Between 1992 and 2012, the annual average number of prisoners who received compassionate release following a motion by the BOP was fewer than two dozen.  *See* Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons*, 2 (Nov. 2012), https://www.hrw.org/sites/default/files/reports/us1112ForUploadSm.pdf (emphasizing that BOP has chosen to reject compassionate release in all but a few cases).

grounds. And, as Rahim points out, the Sentencing Commission itself has acknowledged its obligation in the light of the First Step Act to amend U.S.S.G. § 1B1.13 and the accompanying Application Notes to reflect the removal of the BOP as the gatekeeper for such motions. (Dkt. 186 at 17); U.S. Sentencing Commission, *Summary Statement of Account Requirements* 10.7 (2020), https://www.uscourts.gov/sites/default/files/ united_states_sentencing_commission_0.pdf ("[F]ull implementation of the [First Step] Act requires . . . a newly constituted Commission . . . to amend the *United States Sentencing Commission Guidelines Manual* at § 1B1.13 to reflect the new authority for a defendant to file a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)."). The Sentencing Commission, however, currently lacks the quorum required to amend the Sentencing Guidelines. *See* 28 U.S.C. § 994(a) (explaining that the Sentencing Commission acts "by affirmative vote of *at least* four members" (emphasis added)); U.S. Sentencing Commission, *Annual Report* 2 (2020), https://www.ussc.gov/sites/default/files/pdf/research- and-publications/annual-reports-and-sourcebooks/2020/2020-Annual- Report.pdf ("Throughout much of FY 2020 and into FY 2021, the

Commission operated with only two voting commissioners . . . .").[6]   The Sentencing Commission thus has been unable to revise U.S.S.G. § 1B1.13 in response to the First Step Act, and no amendment or new policy statement appears forthcoming.   The Sentencing Commission's failure to act (albeit through no fault of its own) cannot preclude a court from enforcing an inmate's right to seek compassionate release pursuant to the First Step Act.

The government argues that saying U.S.S.G. § 1B1.13 is inapplicable to compassionate release motions brought by defendants ignores the Supreme Court's mandate in *Dillon v. United States*, 560 U.S. 817 (2010).  (Dkt. 191 at 13–15.)  In that case, the Supreme Court dealt with a different section of the compassionate release statute (18 U.S.C.

---

[6] *See also United States v. Maumau*, --- F.3d ----, 2021 WL 1217855, at *11 (10th Cir. Apr. 1, 2021) ("Although Congress's enactment of the First Step Act and its amendment of § 3582(c)(1) should have prompted the Sentencing Commission to revise the policy statement set forth in § 1B1.13, the Sentencing Commission has, to date, been unable to do so. The Sentencing Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines.  28 U.S.C. §§ 991(a) (setting forth the number of members), 994(a) (requiring the vote of four members).  Since the First Step Act was enacted, the Commission has had only two voting members.  Thus, the Commission has been unable to comply with its statutory duty of promulgating a post-First Step Act policy statement regarding the appropriate use of the sentence reduction provisions of § 3582(c)(1)(A)(i).").

§ 3582(c)(2)) and its corresponding policy statement (U.S.S.G. § 1B1.10(b)). The Supreme Court addressed whether its decision in *United States v. Booker*, 543 U.S. 220 (2005), which rendered the Guidelines advisory to remedy the Sixth Amendment problems associated with a mandatory sentencing regime, requires treating § 1B1.10(b) as nonbinding. The Court held § 1B1.10(b) *is* binding on a court dealing with an 18 U.S.C. § 3582(c)(2) motion. *Dillon*, 560 U.S. at 829. In other words, *Dillon* stands only for the uncontroversial proposition that a sentence reduction under the compassionate release statute must be consistent with the *applicable* policy statement (i.e., the policy statement is binding, not merely advisory). Here, the Court's conclusion is not at odds with *Dillon*. The Court is not treating U.S.S.G. § 1B1.13 as advisory; instead, the policy statement that used to be applicable is no longer applicable given the First Step Act, and courts are only required to ensure a sentence reduction is consistent with *applicable* policy statements. *See* 18 U.S.C. § 3582(c)(1)(A).

And, although the Eleventh Circuit has not addressed this issue,[7]
seven courts of appeals agree with the Court's conclusion that, despite
the text of Application Note 1(D), the First Step Act freed courts to
exercise their discretion in determining what is extraordinary and
compelling for compassionate release motions brought by prisoners.[8]  A

---

[7] On November 17, 2020, the Eleventh Circuit held oral argument on this
issue in two cases.  *See United States v. Winner*, 835 F. App'x 1002 (11th
Cir. 2020); *United States v. Bryant*, No. 19-14267 (11th Cir. filed Oct. 24,
2019).  The cases were consolidated for oral argument purposes only.  In
*Winner*, the Eleventh Circuit declined to address whether district courts
could determine what constitute "extraordinary and compelling" reasons
warranting compassionate release under § 3582(c)(1)(A) independent of
U.S.S.G. § 1B1.13.  *See* 835 F. App'x at 1003 (affirming on different
grounds).  *Bryant* remains pending.  In another case, *United States v.
Harris*, 989 F.3d 908 (11th Cir. 2021), the Eleventh Circuit declined to
address the issue but cited other courts of appeals' opinions which held
§ 1B1.13 is no longer an applicable policy statement for compassionate
release motions brought by prisoners.  *Id.* at 912 n.2.

[8] *See Brooker*, 976 F.3d at 237 ("[T]he First Step Act freed district courts
to consider the full slate of extraordinary and compelling reasons that an
imprisoned person might bring before them in motions for compassionate
release.  Neither Application Note 1(D), nor anything else in the
now-outdated version of Guideline § 1B1.13, limits the district court's
discretion."); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020)
("There is as of now no 'applicable' policy statement governing
compassionate-release motions filed by defendants under the recently
amended § 3582(c)(1)(A), and as a result, district courts are
'empowered . . . to consider *any* extraordinary and compelling reason for
release that a defendant might raise.'" (quoting *Brooker*, 976 F.3d at
230)); *United States v. Shkambi*, --- F.3d ----, 2021 WL 1291609, at *4 (5th
Cir. Apr. 7, 2021) ("[W]e conclude that neither the policy statement nor

growing number of district courts have also ruled that way.[9]   The

government urges the Court to disregard these cases and follow the

_____

the commentary to it binds a district court addressing a prisoner's own motion under § 3582."); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020) ("Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion."); *United States v. Gunn*, 980 F.3d 1178, 1181 (7th Cir. 2020) ("Until . . . § 1B1.13 is amended . . . the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release.  District judges must operate under the statutory criteria—'extraordinary and compelling reasons'—subject to deferential appellate review."); *United States v. Aruda*, --- F.3d ----, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021) (per curiam) ("We agree with the persuasive decisions of our sister circuits and also hold that the current version of U.S.S.G. § 1B1.13 is not an 'applicable policy statement' for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant."); *United States v. McGee*, --- F.3d ----, 2021 WL 1168980, at *12 (10th Cir. Mar. 29, 2021) ("We conclude instead, as have the Second, Fourth, Sixth, and Seventh Circuits, that the Sentencing Commission's existing policy statement is applicable only to motions for sentence reductions filed by the Director of the BOP, and not to motions filed directly by defendants.").

[9] *See, e.g.*, *United States v. Young*, 458 F. Supp. 3d 838, 845 (M.D. Tenn. 2020); *United States v. Brown*, 457 F. Supp. 3d 691, 701 (S.D. Iowa 2020); *United States v. Marks*, 455 F. Supp. 3d 17, 24 (W.D.N.Y. 2020); *United States v. Redd*, 444 F. Supp. 3d 717, 724–25 (E.D. Va. 2020); *United States v. Decator*, 452 F. Supp. 3d 320, 324 (D. Md. 2020); *United States v. Haynes*, 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020); *United States v. Quinn*, 467 F. Supp. 3d 824, 830–31 (N.D. Cal. 2020); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019); *United States v. Lott*, No. 95cr72, 2020 WL 3058093, at *2 (S.D. Cal. June 8, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *4 (D. Utah

minority of courts that have held U.S.S.G. § 1B1.13 remains applicable.[10] The Court declines to do so for the reasons stated above.

Having decided this Court has authority to determine what constitutes "extraordinary and compelling" for compassionate release purposes, the Court turns to deciding whether Rahim's circumstances qualify for compassionate release. As stated above, the compassionate release statute, as amended by the First Step Act, provides in relevant part:

> [T]he court, . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i). Because the Court found U.S.S.G. § 1B1.13 is inapplicable to Rahim's request, the last part of the statute does not

---

Feb. 18, 2020); *United States v. Schmitt*, No. CR12-4076, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *United States v. Valdez*, No. 3:98-cr-0133-01, 2019 WL 7373023, at *2 (D. Alaska Dec. 31, 2019); *United States v. Fox*, No. 2:14-cr-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019).

[10] *See, e.g.*, *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn*, No. 89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, No. 12-cr-00410, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019).

matter because there is no applicable policy statement. *See, e.g.*, *Gunn*, 980 F.3d at 1180 ("[T]he Sentencing Commission has not yet issued a policy statement 'applicable' to [the defendant's] request.  And because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion.  Any decision is 'consistent with' a nonexistent policy statement.  'Consistent with' differs from 'authorized by.'").  Thus, to rule on the requested relief, the Court must (1) determine whether extraordinary and compelling reasons warrant a reduction of Rahim's sentence and (2) consider the factors set forth in § 3553(a) to the extent that they are applicable.

### 2.    Extraordinary and Compelling Circumstances Warranting a Reduction in Rahim's Sentence

Rahim seeks relief based on a holistic review of the circumstances of his case, including sentence length, rehabilitation, childhood trauma, the aberrant nature of his behavior giving rise to his convictions, and his good conduct in prison.  (Dkts. 186 at 25–31; 196 at 21–22.)  The government argues compassionate release is discretionary, and the Court should exercise its discretion to deny Rahim's request.  (Dkt. 191 at 39.)

18

As to Rahim's sentence length, Rahim was sentenced to slightly over 40 years for his crimes. The robbery and carjacking accounted for only 97 months of that sentence; those 97 months were followed by a mandatory, consecutive 7-year term on the first § 924(c) firearm count and a then-mandatory, consecutive 25-year term on the second § 924(c) firearm count. (Dkt. 186 at 9.) Rahim argues that, if he were sentenced today, he would face a significantly lower sentence because Congress amended § 924(c) in § 403 of the First Step Act to prevent the so-called "stacking" of § 924(c) charges arising from the same crime. (*Id.* at 22–23.) Because of that amendment, he argues "the government can no longer invoke the breathtaking 25-year enhanced mandatory consecutive sentence for a 'second or successive' § 924(c) conviction in the same case in which the first such conviction was obtained." (*Id.* at 22.) He is correct. Section 924(c)(1)(C) now provides: "*In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final*, the person shall . . . be sentenced to a term of imprisonment of not less than 25 years . . . ." 18 U.S.C. § 924(c)(1)(C) (emphasis added). So, the enhanced penalty does not apply when a defendant is convicted of multiple § 924(c) charges at the same time. This means Rahim could

19

not have faced the mandatory 25-year enhancement if charged for his crimes today.

The government acknowledges this change but argues the First Step Act does not apply retroactively. (Dkt. 191 at 7–8.) It says that—while it could not charge Rahim with the multiple § 924(c) charges today—his conviction for both charges remains valid and the provision directing that each sentence under § 924(c) run consecutively to any other sentence imposed remains unchanged. (*Id.* at 7 & n.1.) The Court agrees that the First Step Act's amendment to § 924(c) does not apply retroactively. *See* First Step Act § 403(b) ("This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, *if a sentence for the offense has not been imposed as of such date of enactment*." (emphasis added)). Rahim, however, is not attempting to apply § 403 retroactively. Rather, Rahim requests a sentence reduction under the amended compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), and argues the First Step Act's amendment of § 924(c) is an "extraordinary and compelling" circumstance for purposes of relief under the compassionate release statute. (Dkt. 196 at 8–9.)

That relief under the First Step Act is not automatically available to all defendants does not mean the basis for the change in the law is irrelevant to the consideration of a specific defendant's circumstances under § 3582(c)(1)(A)(i).  While Congress obviously did not want to provide relief across the board to all defendants previously convicted of "stacked" § 924(c) charges, nothing suggests Congress sought to preclude a court contemplating an application for compassionate release from considering the drastic impact from such charges when Congress amended the statute to preclude stacking but decided not to make the relief retroactive.  Other courts have reached the same conclusion:

> Notably, the only rationale offered by the government for opposing the relief sought is the contention that Congress did not specify that Section 403 of the FSA [amending 18 U.S.C. § 924(c)] should apply retroactively.  However, this simply establishes that a defendant sentenced before the FSA is not *automatically* entitled to resentencing; it does not mean that the court may not or should not consider the effect of a radically changed sentence for purposes of applying § 3582(c)(1)(A).  That is, the fact that the FSA changes in § 924(c) were not explicitly retroactive is "relevant but ultimately has little bearing" on whether the court is empowered to act under Section 3582, because "it is not unreasonable for Congress to conclude that not *all* defendants convicted under § 924(c) should receive new sentences, even while expanding the power of the courts to relieve *some* defendants of those sentences on a case-by-case basis."

*United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *1 (D. Kan. Feb. 21, 2020) (internal citations omitted) (quoting *Maumau*, 2020 WL 806121, at *7); *see also Haynes*, 456 F. Supp. 3d at 516.

Many courts have concluded that the severity of a § 924(c) sentence, combined with the enormous disparity between that sentence and the sentence a defendant would receive today, can constitute an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A)(i).[11]   The Court finds their reasoning persuasive.   The

---

[11] *See, e.g.*, *McCoy*, 981 F.3d at 286 ("[W]e find that the district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act."); *Young*, 458 F. Supp. 3d at 848 (finding "the drastic change effected by the First Step Act's amendment of § 924(c) constitutes an extraordinary and compelling reason for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)"); *United States v. Poulnott*, No. 1:89-cr-00001-AT-ALC-1, 2020 WL 7974295, at *3 (N.D. Ga. Dec. 30, 2020) ("The possibly dramatic difference between the sentence the Defendant received in 1989 and the sentence that the Defendant would receive today is itself an extraordinary and compelling reason to provide the relief sought by the Defendant."); *Maumau*, 2020 WL 806121, at *7 ("[T]his court concludes that the changes in how § 924(c) sentences are calculated is a compelling and extraordinary reason to provide relief . . . ."); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *4 (D. Neb. Nov. 14, 2019) ("A reduction in [the defendant's] sentence is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed.").

First Step Act's amendment of § 924(c) resulted in an exceptionally dramatic change in sentencing.  There is no doubt that there is a gross disparity between the sentence Rahim received in 2005 and the sentence he would receive today after the passage of the First Step Act.  To quantify that more precisely, he faces 18 additional years in prison as a result of the second § 924(c) charge that would not be permissible today. This difference is an extraordinary and compelling reason to provide the relief sought by Rahim.  When the sentence disparity is combined with the § 3553(a) factors, the extraordinary reasons become even more compelling.

### 3.    18 U.S.C. § 3553(a) Factors

Having found extraordinary and compelling reasons exist, the Court must next "consider[] the factors set forth in section 3553(a) to the extent they are applicable" to determine what type of new sentence would be appropriate.  18 U.S.C. § 3582(c)(1)(A).  Rahim's crime was egregious and needlessly endangered Ms. King, police officers, and himself.   But he committed that crime when he was very young—only 20 years old. (Dkt. 186 at 8.)   Research shows that criminal behavior in youthful offenders is often not an indication of an indelible personality trait.  *See*

MacArthur Foundation Research Network on Law and Neuroscience, *How Should Justice Policy Treat Young Offenders?*, Law & Neuro (Feb. 2017), https://www.lawneuro.org/adol_dev_brief.pdf.  Youthful offenders, even those who commit serious crimes, usually will age out of offending and will not become career criminals.  *Id.*  Rahim's adolescence was marred by the death of his older brother and his child's mother.  (Dkt. 186 at 8.)  Rahim's older brother died while playing Russian roulette with friends when Rahim was 14, and the mother of Rahim's child committed suicide in Rahim's presence shortly after the birth of the child.  (*Id.*)  His criminal conduct also seemed out of character.  At the March 3, 2021 hearing, the Assistant United States Attorney responsible for Rahim's prosecution explained that, before his arrest, Rahim worked as an EMT and ambulance driver.  (March 3rd Hearing Tr. at 48:11–49:7.)   He was thus known to people who worked at Grady Hospital, the hospital at which he was treated after being shot during his arrest.  (*Id.*)  The Assistant United States Attorney explained that, when Rahim's former colleagues learned what Rahim had done, they were "flabbergasted and

shocked" because they knew him as a "sweet guy" and a "quiet" person. (*Id.*)

Rahim is now 38 years old.  (Dkt. 158 at 4.)  He recognizes the seriousness of his crimes and has taken responsibility by expressing remorse for his actions and the harm he caused to the community and his victims.  (Dkt. 186 at 28.)  Rahim states, and his BOP inmate records corroborate, that he has used his time in custody to rehabilitate himself and taken steps to prepare for post-release life.[12]  He has "an extensive inmate education transcript, logging over 1800 hours in programming on varying topics that demonstrate a passion for learning and self-improvement."  (Dkts. 186 at 27; 186-1.)  He has taken classes on job-readiness training (e.g., career planning, banking needs, writing resumes), computer applications (e.g., typing, Microsoft Access, Microsoft Excel), vocational skills (e.g., personal training, paralegal training), personal wellness (e.g., anger management, drug and alcohol awareness), and parenting (e.g., "Inside Out Dad").  (Dkt. 186 at 27–28.)  While in

---

[12] In 2016, this Court recognized that Rahim's "conduct while in the custody of the [BOP] appears to have been good—and, indeed, in recent years, exemplary—and that [Rahim] has made wise use of his time in custody to attempt to improve himself."  (Dkt. 133 at 8–9.)

custody, he has worked as a tutor helping other inmates study for the GED and served as a library clerk in the prison library. (*Id.* at 28.)

Rahim also has a large, supportive community who awaits his release and will help him transition to life after prison. (*Id.*) His mother, who visits Rahim regularly in prison and speaks to him weekly on the phone, has offered her residence as a place for Rahim to live whenever he is released. (Dkts. 186 at 28–29; 186-2.) In addition, a family friend who works in Georgia's film industry has attested that he is "prepared to provide [Rahim] with an opportunity to prove himself to be a valued member of his team" as a crew member upon Rahim's release. (Dkts. 186 at 29; 186-3.)

The Court also finds that Rahim is not a danger to the safety of any other person or to the community. A bulging disc in Rahim's spine has kept him in a wheelchair for nearly a year, although he seems to have recovered from the injury. (Dkt. 186 at 31 n.13.) Rahim's inmate record shows only a few disciplinary infractions over the course of his confinement, and he has not had any disciplinary incidents since April 2013. (Dkts. 186-6; 191-2.) Notably, the government has "no evidence or indication that Mr. Rahim will reoffend." (March 3rd Hearing Tr. at

48:7–10.)  Finally, having heard from Rahim directly during the March 22, 2021 hearing, the Court concludes that he feels remorse for his criminal conduct, most notably his treatment of Ms. King, the victim.

## III.  Conclusion

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Relief under 18 U.S.C. § 3582(c)(1)(A)(i) (Dkt. 186).

The Court **REDUCES** Defendant's sentence to **TIME SERVED**, followed by a five-year term of supervised release under the same terms and conditions of supervised release previously imposed.  The Court reduces Rahim's sentence to time served based on its consideration of the factors set forth in 18 U.S.C. § 3553, the information contained in the Presentence Report prepared at the time of his original sentencing, and the information contained in his application for compassionate release. The Court recognizes that Rahim might have faced a longer sentence than the time he has already been in custody if sentenced in 2005 without stacked § 924(c) charges.  Defendant committed the crime on July 8, 2003, and he has been imprisoned since his arrest on that date.  (Dkt. 158 at 1.)  He has been in custody a total of 17 years and 9 months (213 months in all).  If he had been sentenced to 7 years (instead of 25 years)

27

for the second § 924(c) charge, he likely would have received a total sentence of 265 months—that is, 97 months for the substantive charges, 84 months for the first § 924(c) charge (as imposed by the Court), and 84 months for the second § 924(c) charge.   (This of course assumes the sentencing judge applied all other considerations the same.)   Eighty-five percent of that time (which federal defendants serve assuming good behavior) is 225 months, approximately 12 months longer than he has been in custody.   But, as explained above, the United States believes he exercised his right to trial because he was unwilling to accept the mandatory 25-year sentence from the stacked charge.   Perhaps, if that mandatory sentence had not been available, he would have pled guilty and received credit on his sentence for acceptance of responsibility.   It is impossible to go back in time and recalculate the "likely" sentence considering only the changes provided by the First Step Act, and the Court does not believe it is required to do so.   Instead, the Court exercises its discretion and judgment (upon consideration of the § 3553 factors and the information identified herein) to reduce Rahim's sentence to time served.

It is **ORDERED** that the Bureau of Prisons shall release Defendant from its custody after a fourteen-day quarantine period and medical clearance to minimize the possibility of any spread of COVID-19. The United States Attorney for the Northern District of Georgia is **DIRECTED** to notify the Bureau of Prisons of the issuance of this Order so that its provisions can be put into effect as quickly as possible.

**SO ORDERED** this 14th day of April, 2021.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE